## JAMES NORRIS vs. CITY OF BOSTON.

There is nothing repugnant to the constitution or laws of the United States in the third section of *St.* 1837, *c.* 238, which prohibits the landing of alien passengers, who arrive in any vessel at any port or harbor in this State, until the master, owner, consignee or agent of the vessel, shall pay to the regularly appointed boarding officer the sum of two dollars for each passenger, to be appropriated for the support of foreign paupers.

THIS was an action of assumpsit for money had and received, to recover $38, the amount paid by the plaintiff to Calvin Bailey, the defendants' agent. In the court of common pleas, at the October term 1839, the parties filed the following statement of facts :

" The plaintiff, an inhabitant of St. John, in the province of New Brunswick, and kingdom of Great Britain, arrived in the port of Boston, on or about the twenty-sixth day of June 1839, in command of a certain schooner, called the Union Jack, of and belonging to said port of St. John. There were on board said schooner, at the time of her arrival in Boston, nineteen persons who were passengers in said Union Jack, aliens to each and every of the States of the United States, but none of them were lunatics, idiots, maimed, aged, or infirm. Prior to the landing of said passengers, the sum of two dollars for each and every passenger was demanded of the plaintiff by Calvin Bailey, in the name of the city of Boston, and said sum, amounting to $38, was paid by the plaintiff to said Bailey, for permission to land said alien passengers in said Boston ; said sum being paid

by the plaintiff under a protest that the exacting of the same was illegal.

" Said Calvin Bailey was the regularly appointed boarding-officer, appointed by the City Council of the city of Boston, in pursuance of the 238th chapter of the statutes of this Commonwealth, passed in the year 1837 ; and it was in pursuance of the provisions of said statute, and in conformity with the provisions of an ordinance of the city of Boston, that said Bailey demanded and received said sum."

On these facts, it was agreed that judgment should be rendered for the plaintiff, if he could recover in any form of action, or that he should become nonsuit, according to the opinion of the court.

The plaintiff contended that said *St.* of 1837, *c.* 238, entitled "an act relating to alien passengers," was unconstitutional, and in violation of the treaties between the United States and the kingdom of Great Britain, and that said sum of money was therefore illegally demanded and obtained by the defendants.

*Williams,* C. J. ruled that said statute was constitutional, and that the execution thereof by the defendants, by their said agent, did not violate any of the existing treaties between the United States and the government of Great Britain, and thereupon ordered the plaintiff to become nonsuit. To this ruling the plaintiff alleged exceptions.

This case was argued at the last March term, by *Choate &amp; T. Otis,* for the plaintiff, and by *J. T. Austin,* (Attorney General,) and *E. G. Austin,* (City Attorney,) for the defendants.

SHAW, C. J. Although the amount depending upon the result of this case is small, the question which it presents for the consideration of the court is of great importance, and arises upon a bill of exceptions taken at the trial of the cause before the court of common pleas. It is an action of assumpsit to recover the sum of $ 38, money had and received, which the plaintiff alleges he was compelled, under color of law, to pay, and did pay to an officer and agent of the city of Boston, demanding the same for their use, and which they actually received ; and he asserts the right to recover it back, on the ground

that the exaction, under the circumstances stated in the bill of exceptions, was illegal ; that the payment was not voluntary, but was made under a protest denying the justice and validity of the claim. There is no controversy about the facts, and no question of the plaintiff's right to recover of the defendants the money thus paid, if in truth the legislative act, under which it was demanded, was inoperative and void. The demand was confessedly made by Bailey, an agent appointed by the authority of the city, and acting in their behalf, pursuant to the provisions of *St.* 1837, *c.* 238, § 3 ; and if that act had not the force of law to warrant the demand, it was an illegal exaction of money, which the plaintiff may recover back in this form of action. This act, having been passed under all the forms required by the constitution to give it the force of law, must be regarded as valid, unless it can be clearly shown to be contrary to the constitution of the United States. Whether it is so, is therefore the only question in the case.

As this question must depend mainly upon a comparison of the statute of the Commonwealth with the laws of the United States, to determine whether they are in conflict, it may be proper to begin by a careful examination of the statute, not only with reference to its particular enactments, but to the object and purpose for which they were established. The statute of 1837, *c.* 238, was but a modification of a series of legislative acts, extending to a period long anterior to the establishment of the present constitution of the Commonwealth, having for their object to make provision for the relief of poor and destitute persons, being within the limits of the State, and whether such persons were citizens and subjects of the State or not ; and to prevent the increase of this burden upon the State, by prohibiting the introduction of paupers from other places, or to admit such introduction upon conditions intended to secure the State from this burden. The general provisions of the poor laws of this State make it the duty of the proper officers of cities and towns to furnish immediate relief to any poor person being within their limits, without regard to the consideration, whether such persons have a settlement in such town, or in any other town of the

State or not, or whether he be the citizen or subject of any otner State or country. The only things necessary to give him a title to such relief from the officers of such city or town, are, that he is a human being, that he is within their limits, and that he needs relief. If he has a settlement in such town, the expense of such relief is to be borne by them ; if he has a settlement in any other town in the State, they are bound to reimburse the town thaʋ first offered relief ; if he has no settlement in any town in the State, the expense is to be reimbursed to the town, thus bound to act as almoners in the first instance, from the treasury of the Commonwealth. The consequence is, that every person, whether citizen or foreigner, is to be relieved, and the expense of such relief is to be borne, according to varying circumstances, by the Commonwealth or some of its members.

The law in regard to alien passengers is a branch of this great department of State policy, designed to guard this privilege of relief at the public expense, in cases of extreme indigence, from abuse, and to secure the State and its citizens from unreasonable burdens, whilst providing for the exercise of a duty of humanity towards those, who in the ordinary course of life are placed within its borders. We will briefly refer to this course of legislation. The St. of 1793, c. 59, was a general act, providing foɪ the relief, support, employment and removal of the poor, and repealed all previous acts on the subject, with certain exceptions. Section 13 provided for the relief of all poor persons, having no lawful settlement within the Commonwealth, when they stood in need. The same section directed a mode by which such persons might be conveyed, by land or water, to any other State, or to any place beyond sea, if they might be conveniently removed. Section 15 gave a penalty against any person, who should bring into and leave any indigent person in any town, where he was not lawfully settled, knowing him to be poor and indigent. Section 16 prohibited masters of vessels from bringing into the State any person convicted, in any other State or country, of any crime, or any infamous persons. And to prevent charge to the Commonwealth by the importation of such con‑ victs, or of infamous or vicious persons, section 17 made i

the duty of masters of vessels, arriving with passengers on board, from any foreign country, to make report of their names, &c. to the overseers of the poor. Further provisions were made on the same subject by *St.* 1819, *c.* 165, which required masters of vessels to furnish a list of passengers having no settlement within the Commonwealth, and, if required by the overseers of the poor, to give bond, with sureties, to indemnify such town, and also the Commonwealth, from any charge or expense for such passengers, for the term of three years.

Thus stood the law, until the *St.* of 1830, *c.* 150, was passed, providing that when any ship or vessel should arrive in any place in this State, with alien passengers on board, who might become chargeable as paupers, the master should report, &c., and should give bond, with surety, to indemnify the town and the Commonwealth ; with a proviso, that such bond might be dispensed with, in all cases, when the overseers might think it unnecessary ; and further, that it might be dispensed with, in regard to any such passenger, in behalf of whom the master or owner of such vessel should pay into the treasury of the town the sum of five dollars. This, we believe, was the first introduction of a provision for the payment of a small sum of money, by way of commutation for the obligation of indemnifying towns against the risk of expense to be incurred for the relief of such paupers. These provisions were substantially reënacted in the Rev. Sts. *c.* 46, embracing various collateral provisions, designed to carry the objects of the law into full effect.

Such was the law previously to the year 1837, when the act was passed, upon the particular provisions of which this question arises. *St.* 1837, *c.* 238. The first section provides, that when any vessel shall arrive with alien passengers, an officer, to be appointed by the mayor and aldermen of the city, or the selectmen of the town, where it is proposed to land such passengers, shall go on board such vessel and examine into the condition of said passengers. Section 2d directs, that if on such examination, there shall be found among said passengers, any lunatic, idiot, maimed, aged or infirm persons, incompetent to maintain themselves, or who have been paupers in any other country, no such

alien passenger shall be permitted to land, until the master, owner, consignee or agent of the vessel, shall give bond, that no such lunatic or indigent passenger shall become a city, town, or State charge, within ten years. Section 3d enacts, that no other alien passengers shall be permitted to land, until the master, owner, consignee, or agent, shall pay to the boarding officer two dollars for each passenger so landing ; and that the money, so collected, shall be paid into the treasury of the city or town, to be appropriated, as the city or town may direct, for the support of foreign paupers. Sect. 4th requires the pilots of the port to anchor vessels at places previously appointed as suitable for the examination of such passengers. Sect. 5th limits the operation of the act, so that it shall not apply to passengers taken from a wreck, or coming on shore in distress. Sect. 6th applies to this act, and continues in force, §§ 28 and 29 of the Rev. Sts. c. 46, providing penalties for any violations of this act, and directing that it shall not apply to seamen sent home from any foreign place by a consul of the United States.

It was in conformity with the requisitions of the third section of this act, that the money was paid, which is sought to be recovered back, in this action. It will be perceived that the whole scope and tenor of this act, is to carry out more effectually the policy of the preceding acts, viz. that of securing the Commonwealth and its citizens from the burden likely to arise from an influx of foreign paupers ; and the principal, if not the only particular, in which this act differs from the preceding, is this ; that in cases where the alien passenger is not, at the time, infirm, or otherwise disabled, so as to require immediate relief, the master of the vessel, instead of being at liberty, at his election, to pay five dollars to cover the risk that such passenger will become a pauper and chargeable to the public — as a commutation for the duty of giving bond, with surety, conditioned to indemnify the public against the same peril — is unconditionally required to pay the sum of two dollars. This act having been passed in due form, and received the sanction of all branches of the legislature, is valid and binding, unless it comes in conflict with the constitution of the United States or of some law made

in pursuance of its enumerated powers. If it be in any respect repugnant thereto, to that extent it is inoperative and void; because the constitution of the United States, and all laws and treaties made in pursuance of the powers vested in the general government, are the supreme law of the land. But an act of the State legislature is no further void, than as its provisions are thus repugnant to the constitution or laws of the United States; and consequently the same act may be valid in part and void in part. *Commonwealth* v. *Kimball,* 24 Pick. 359. The question therefore in the present case is, not whether some single provision may not be found in this act, which may conflict with the law of the United States, but whether the provision requiring the master or agent of a vessel, arriving within the limits of the State, with alien passengers on board, liable to become chargeable to the State, to pay two dollars for each of such passengers, before he can be permitted to land them, conflicts with that law.

Upon the best consideration which the court have been able to take of the subject, they are of opinion that this provision of the law in question is valid and binding, and that the plaintiff was rightfully required, by force of it, to pay the money in question; because, *first,* the object to be accomplished by the act was quite within the competency of State legislation to provide for; *secondly,* the legislature might do this by means of any suitable and appropriate legal provisions, not repugnant to the constitution or laws of the United States; and, *thirdly,* the provision in question was not thus repugnant.

1. The power of the State to establish poor laws, and for that purpose to make reasonable provisions to prevent the introduction of paupers, or persons likely to become paupers, is too well established to require the citation of many authorities. The powers reserved to the States are considered to extend to all the objects which, in the ordinary course of affairs, affect the lives, liberties and property of the people, and the internal order, improvement and prosperity of a State. Federalist, No. 45. Amongst the objects to be accomplished by State laws, these were enumerated by Mr. Chief Justice Marshall, in *Gibbons* v

*Ogden,* 9 Wheat. 203 ; viz. " inspection laws, quarantine laws, health laws of every description, as well as laws regulating the internal commerce of a State." And the same eminent judge, in *Brown* v. *Maryland,* 12 Wheat, 443, 444, says, " the power to direct the removal of gunpowder is a branch of the police power, which unquestionably remains, and ought to remain, with the States." " The removal or destruction of infectious or unsound articles, is undoubtedly an exercise of that power, and forms an express exception to the prohibition we are considering."

But without relying on these obviously analogous cases, we think this point has been expressly decided by the supreme court of the United States, namely, that the States have the power to pass laws regulating the introduction of persons who may become paupers ; that the power existed before the formation of the constitution of the United States and was not taken away by it. *City of New York* v. *Miln,* 11 Pet. 102. It was held that the law of New York on the same subject was a regulation of police and not of commerce, and clearly within the competency of State legislation. The court say there is no aspect in which it can be viewed, in which it transcends the limits of the reserved powers of the States : " If we look at the place of its operation we find it within the territory, and therefore within the jurisdiction, of New York. If we look at the person on whom it operates, he is found within the same territory and jurisdiction. If we look at the persons for whose benefit it was passed, they are the people of New York, for whose protection and welfare the legislature of that State are in duty bound to provide. If we turn our attention to the purpose to be attained, it is to secure that very protection, and provide for that very welfare." Even the learned judge (Mr Justice Story) who dissented from the opinion of the rest of the court, on another part of the case, admitted in the most unhesitating manner, that the States have a right to pass health laws, and other police laws, not contravening the laws of congress rightfully passed under their constitutional authority. He says further, " I admit that they have a right to pass poor laws, and laws to prevent the

introduction of paupers into the State, under like qualifications. I go further, and admit that in the exercise of their legitimate authority over any particular subject, the States may generally use the same means, which are used by congress, if those means are suitable to the end." But he considered that the act of New York was an act regulating commerce, and dissented on that ground.

All the circumstances enumerated by the court, in the case cited, as characteristics and tests of the legitimate authority of a State, are applicable to the law of Massachusetts now under consideration. Its operation is within the territory of the State. The persons on whom it operates are within its limits and jurisdiction ; indeed, such persons are so situated when the law respecting them takes effect ; they are then so within the State, that, in case of their being sick, maimed, insane, or otherwise in condition to require immediate relief, the city or town, in which they happen to be, would be under legal obligation to afford them that relief. At the same time that the public requires that an investigation be made into the condition and circumstances of such alien passengers, arriving in the State, and the payment of a small sum of money to defray, in part, the expenses of the administration of this branch of police, the same persons have, by law, a reciprocal right to call on the public for relief and support, if required.

2. If the object to be accomplished is within the competency of State legislation, are the means which are adopted, suitable and appropriate, and within the power of the State government ?

The means, provided by this act, are the appointment of suitable officers, to go on board vessels that have arrived within the limits of the town or city, and have come within the jurisdiction of the State, to ascertain the condition of such alien passengers, before such passengers are landed ; the requirement of bonds of indemnity to the public, against any expense for their support for ten years, in behalf of those who are lunatic, maimed, or otherwise incompetent, in the opinion of the examining officer, to maintain themselves ; and the payment of a small sum of money, in respect to all others, little more than sufficient to pay the ex-

penses of the investigation, and the maintenance of the establishment ; the balance, if any, to be appropriated for the support of foreign paupers.

These appear to be means well adapted and quite appropriate to accomplish the object proposed — that of the relief of the indigent, and the protection of the State. If the law operates upon the passengers before they have actually landed, this is merely a matter of convenience, like the collection or security of the duties on goods. The goods would be equally liable, if such were the provision of the law, if the duty were levied after the goods were landed. But, although the law operates upon such aliens, before they are landed, it does not operate before they are entitled to participate in the bounty, which the State, in the exercise of the duty of simple humanity, has provided for those aliens. It is no doubt voluntary with the State, whether they will make such provision or not ; but if they do, they have a corresponding power to make reasonable regulations to prevent its abuse, and secure its benefits to the proper objects. Take these provisions together, as a whole, as parts of a system, and it will be found that they are beneficial to those on whom they operate. The right acquired is more than equivalent in value to the amount paid. The small sum required to be paid, on account of each · passenger not requiring relief, is little more than sufficient, if any, to meet the expenses incident to these necessary investigations and precautionary measures. It cannot be known till the investigation has been made, whether all may not be in a condition incompetent to maintain themselves ; and there fore all must be examined.

We have assumed, for the purposes of this inquiry, that the real and sole object of this law, on the part of the legislature, was in good faith to carry into effect that part of the poor laws of the State, which provides relief for every suffering member of the human family, who is, at the time, within its limits, in cluding the foreigner, however recently brought within its limits And we think this is satisfactorily proved by the terms and provisions of the act, and by the long course of legislation on the subject, extending to a period anterioɪ to the ad͏ ᷤtion of the constitution of the United States.

Such being the object of the act, and the power of the State government upon the subject, we are of opinion, that the measures adopted to accomplish it were suitable and appropriate, and were intended, in good faith, so to accomplish it ; and therefore that these measures were within the legitimate power of the State government, unless they are plainly repugnant to the constitution or laws of the United States.

3. Several grounds are relied upon, to establish the position that this act of Massachusetts is repugnant to the constitution and laws of the United States, and consequently void. The first and principal one is, that it is in conflict with that provision of the constitution, Art. I. § 8, which provides, that " congress shall have power to regulate commerce with foreign nations, and among the several States, and with the Indian tribes," or with laws made pursuant to that power.

We do not deem it material to the decision of this case to consider whether this power, given to congress to regulate commerce, is exclusive or not, so that the mere existence of the power prevents the State from making any law on the subject ; or whether it is a concurrent power, which the States may use until congress has acted upon the subject. Supposing it to be exclusive, when that term is rightly understood and applied, and supposing also, that navigation is a department of commerce, and extends to that species of navigation which is concerned in the transportation of passengers ; it does not follow that the State may make no law in relation to passengers. In *Gibbons* v. *Ogden*, 9 Wheat. 203, in which it was decided, that navigation, concerned in the conveyance of passengers, was a branch of commerce, and of course that congress had power to regulate it, it was also held, that although inspection laws, quarantine laws, health laws, and the like, might essentially affect commerce ; yet the power to regulate commerce was not the source from which they flowed, but the power, originally residing in the States, to regulate those subjects respectively, and not transferred to the general government, or prohibited to the States, by the constitution of the United States.

In considering, therefore, whether it is competent for a State

to pass any particular law, we look rather to the ends to be attained, than to the particular enactments by which they are to be reached.   It cannot be inferred that the State has no authority to pass such law, from the fact, that congress have an affirmative grant of power, under the constitution, authorizing them to pass laws, which relate to the same subject, or which affect the same class of subjects more or less directly.   But if the question be, whether the State can pass any law, the *object and purpose* of which is, to direct, to regulate or control any subject or class of subjects, the administration of which is, in general terms, vested in the general government, it is very clear that it cannot ; and in this sense, the power of congress is exclusive. If, therefore, the object and purpose of a law be, in fact, to regulate commerce with foreign States, or among the States, the power of the United States is exclusive, and the State can pass no such law.  ˙ And it may be further added, that if such be the real object of the act, as manifested by its provisions, although some other purpose may be recited in the preamble, or otherwise expressed, the real and not the expressed object must determine the character of the act ; and if the real object were, to regulate commerce, it would be unconstitutional.

Supposing, then, that congress have a full and exclusive power to pass laws, the object of which is to regulate commerce, as conferred by the constitution of the United States, and that the States have full power, not derived from the constitution, but reserved to them, when the constitution was adopted, to make laws regulating health, the poor, and other subjects of police ; the respective laws of each, made in pursuance of powers flowing from different sources, and designed to accomplish different objects, will act independently, and will be valid, unless the particular means, adopted by them respectively, may conflict with each other.   But the regulation of commerce by law, on the one hand, and the legislation necessary to promote the health, safety, and welfare of the citizens of the States, on the other, are of so large and varied extent, and relate to subjects so intimately connected with each other, that in accomplishing their respective objects, the same species of means may, and

25 *

often necessarily must, be resorted to. The boarding and examination of vessels, the examination of documents and ships' papers, the mustering of officers, crews and passengers, the detention of vessels and persons at suitable places and times, and the inspection of cargoes, are of this character. If then the State, in the exercise of its admitted powers, may adopt certain specific measures, suitable and properly adapted to carry into effect its legitimate objects of police regulation ; and if the United States may, in the exercise of their legitimate powers to regulate commerce, adopt similar measures ; the State law will be constitutional or not, according as congress has or has not adopted and exclusively appropriated the same means, so that the operation of the one is inconsistent with, and necessarily excludes, the operation of the other.

Congress, for instance, under their power to regulate commerce, may sanction the importation of any species of merchandize ; and such importation may include hides, grain, fruit, fish, gunpowder, and every other commodity, at their will. But the hides may become putrid, the grain or fruit may decay, and on arrival poison the atmosphere, and endanger the health of the people. The gunpowder, if landed, may explode and destroy their lives and property. The State has full power to pass and enforce laws to guard against these dangers. But if the specific means do not conflict with each other, both may stand and operate together, though they operate at the same time, upon the same subjects. So the provision for the appointment of pilots, and regulation of pilotage, is within the acknowledged power of the State, though operating directly upon ships and vessels, the instruments of commerce. The State may provide by law for the appointment and commissioning of pilots, may regulate their duties, may require them to board inward bound ships, before their arrival, and may, under reasonable regulations, require the owners and masters of inward and outward bound vessels to employ them, and to pay them a reasonable compensation. So in regard to quarantine laws, they act directly upon ships and vessels, affect the rights and conduct of owners, officers and seamen ; but if not repugnant to the laws of the United States, they are valid.

And so the court are of opinion, that although the transporta-tion of passengers from other States or foreign countries is a legitimate department of navigation and intercourse, and an ob-ject of commerce, and so congress has full power, under the constitution, to regulate it ; yet the State has power also, under its authority to make health laws, to require such passengers to undergo 'a quarantine to prevent the introduction and spread of contagious disease ; and in like manner, under its power to establish poor laws, to require each passenger to undergo a rea-sonable investigation and scrutiny, and for that purpose to be detained at suitable times and places, to give security, when security is necessary for the indemnity of the public, and to pay a moderate sum for the support and maintenance of the estab-lishment, and to defray the expense of thus executing the laws. This opinion is founded on the conviction, that these provisions are not inconsistent with the act of Congress of 1799, *c.* 128, § 46, in relation to passengers and their baggage, nor with that of 1819, *c.* 170, regulating the transportation of passengers, nor with any other law of the United States regulating commerce ; and therefore that they may all stand and operate together.

If indeed the specific measures, adopted by a law of congress, for the regulation of commerce, should come in conflict with the law of the State, then, as the law of Congress, made in pursuance of one of its enumerated powers, is the supreme law of the land, the law of the State must of course yield. If, for instance, a law of the United States, with a view to the security of the revenue, or otherwise, should enact, that no pilot boat, or other vessel, should board an inward bound vessel before arrival, (a case merely stated by way of illustration, which could scarce-ly happen,) it would be repugnant to the law of the State, au-thorizing and requiring pilots thus to board inward bound vessels, and of course such State law would be inoperative and void.

This view of the law affords abundant security against any danger that may be apprehended, that the State laws may em-barrass our commerce, or embroil us with foreign nations. It was unquestionably a main object of the constitution of the United States, in distributing the powers of sovereignty between

the federal and state governments, to give the entire control and management of all our foreign relations to the general government. If therefore it should at any time be found, that the health and quarantine laws, the pilot laws, the poor laws, or any other laws of the States, or either of them, made in pursuance of their powers, become oppressive, or tend to obstruct our legitimate intercourse with foreign nations, it would remain for congress, in the exercise of its acknowledged powers to regulate commerce, to provide a system of uniform and equal laws, to remove such impediments, to secure a just and harmonious intercourse with all foreign powers, and thus secure the peace, safety and welfare of the Union ; and by force of these laws, those of the several States, in conflict with them, would be annulled.   *Wilson* v. *Blackbird Creek Marsh Co.* 2 Pet. 245.

But it was further contended, that the act of Massachusetts, now in question, was void, because it is repugnant to that provision in the constitution of the United States, Art. 1, § 10, which declares that no State shall, without the consent of congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary. for executing its inspection laws.

The obvious meaning of this language is, that no duty shall be levied or imposed upon merchandize or commodities imported or exported.   It would be doing great violence to this language to apply the term impost to a sum of money required of persons arriving in the country, to defray the expense of carrying into effect a reasonable system of poor laws, or to treat such persons as imports.   The term ' impost ' was defined, in the case of *Brown* v. *Maryland*, 12 Wheat. 437.   It is a custom or a tax, levied on articles brought into a country, on things imported ; and the only material point decided in that case, which gives color to the argument we are considering, is, that a tax on the importer, in respect to the articles or things imported, was held to be, in effect, a tax on the things themselves, and thus obnoxious to the constitutional prohibition.   The whole scope of that decision shows that the court did not consider the term *imports* as applying to persons.   Such we understand to be the effect

of the decision in *City of N. York* v. *Miln*, 11 Pet. 156, 137, in which the court say, that persons are not the subject of commerce, and not being imported goods, cannot fall within a train of reasoning founded upon the construction of a power, given to congress, to regulate commerce, and the prohibition to the States from imposing a duty on imported goods.

If indeed the act should require a payment of money, from those passengers who bring merchandize with them, or have goods consigned to them, in the same or any other vessel, then, within the principle of *Brown* v. *Maryland*, as the tax would be levied, in respect to imported articles, it might be deemed an impost on imported goods, and so prohibited to the legislation of a State. But the act in question is not of this character. It applies to all alien passengers, without reference to goods. And if, under color of carrying into effect any police regulation, the manifest object of the law were to raise a revenue on foreign commerce, the real and not the ostensible purpose of the act would be regarded, in determining its constitutionality.

If, for instance, under the form of pilotage, a large sum of money should be demanded of any inward bound vessel, the effect of which would be to raise a revenue upon foreign commerce, the pretence of its being pilotage would not make it legal. And this suggestion answers an argument much pressed, that if the State could demand two dollars, in respect to each passenger, it could demand two hundred or two thousand, and so raise a large revenue for any and all purposes. We think it is plain, that if any such large sum were exacted of passengers, it would indicate the real purpose and design of the law to be to raise revenue, and not in good faith to carry into effect a useful and beneficent poor law ; useful and beneficent to such aliens themselves ; and therefore that it would be in contravention of the constitution and laws of the United States, and void. But to apply this principle to the construction of an act of State legislation, it must be apparent to the court, that the real purpose was distinct from the ostensible one.

Several other provisions of the constitution and laws of the United States were referred to, in the argument, as provisions

of law with which the law in question is supposed to conflict; one of which is, the law regulating the coasting trade and granting a coasting license. Had the vessel in question come from a neighboring State, or sailed under a coasting license, this argument would have been entitled to more weight; as the case is, we think the question does not arise.

The provisions of the constitution and law of the United States on the subject of naturalization were also relied on. These provisions, we think, merely affect the question how aliens shall be naturalized, who are in fact within the jurisdiction of the United States, and do not, in any respect, affect the mode of their introduction.

On the whole, the court are of opinion that the direction of the judge of the court of common pleas was right. The exceptions are therefore overruled, and the judgment for the defendants affirmed.